## OLMSTED and others *against* LOOMIS and GRAVES.

A reservation, in a grant of a water privilege, of so much water " as is neces-
sary for the use of a forge and two blacksmith's bellows," does not limit
the use of the water reserved to the sole object specified; and such refe-
rence to a certain object will be regarded as a measure of the quantity, and
not as a restriction of the use of the water.

An assertion and exercise for more than twenty years by the grantor and his
successors, with the assent of the grantees and their successors, of the right
to use the water reserved for other purposes than those specified, is suffi-
cient to establish the right so to use it.

The recent diversion by the grantees, of part of the water so reserved, from a
paper mill which had been for many years standing on the site of the forge,
furnishes a proper case for the exercise of equity jurisdiction.

To entitle the plaintiff to equitable relief in such a case, it is not necessary
for him first to establish a right at law.

IN the year 1802 Jonathan Wales was the owner of a
tract of land on the Oriskany creek, in the county of
Oneida, on which there was a dam across the creek, a race-
way of eighty-three rods in length along the left bank of the

creek, and a forge for the manufacture of wrought iron situated near the lower end of the race. On the 4th of May in that year, the forge being then in operation, Wales conveyed by deed to Alfred Smith, Solomon Loomis and Eason Trowbridge, under whom the defendants claim title, a part of the land lying between the creek and the race above the forge. The deed contained the following clause: "with the privilege of digging from the head of said race to said land, for the purpose of carrying water sufficient to carry an oil mill; and I, the said Wales, agree that they, the said Smith, Loomis and Trowbridge, shall have the privilege of the water that is not wanted for a forge and two blacksmith's bellows." An agreement in writing under seal was made and executed between the parties, bearing even date with the deed. The agreement recites that the conveyance to Smith, Loomis and Trowbridge, was made "for the purpose of building an oil mill;" and Wales agreed to be at one-quarter of the expense *of widening the race,* "sufficient to carry the above said oil mill," and at one-half the expense of keeping the race and dam in repair; and the grantees agreed to be at three-quarters of the expense of widening the race, and at one-half of the expense of keeping the race and dam in constant repair. Then follows this clause: "And it is mutually agreed that Loomis, Smith and Trowbridge are entitled to all the water as above alluded to, except what is necessary for the use of the forge and two blacksmith's bellows, as is particularly reserved in the above mentioned conveyance, and it is expressly agreed that the above said Loomis, Smith and Trowbridge shall not any way infringe to take away the water belonging to said forge, or which is necessary for said forge; and it is fairly understood by said parties that in case of a dry time when water cannot be obtained for all, then and at all other times the forge above alluded to is to have the preference."

Very shortly after the conveyance and agreement were made, the grantees erected an oil mill on the lot so conveyed

by the deed, and cut a ditch or canal to the main race, which led the water from the mill pond to the forge, and took the water for their oil mill from the main race about twenty-three rods above the forge and about sixty rods below the head of the race. In 1806 or 1807, Wales, the owner of the forge, removed it, and erected a paper mill in its place, and the business of making paper therein was carried on from the time of its erection to the time when the bill in this case was filed, using as much water as was necessary to drive it. During the whole period from the erection of the oil mill until it was purchased by the defendants in December, 1845, the right of the plaintiffs and those under whom they claim to a preference in the use of the water to the extent of the original reservation never was disputed or denied. There was some proof that in a few instances the owners of the oil mill refused to shut down their gate when required to do so by the owners of the paper mill, but the refusal was put on the ground that there was then water enough for both mills. There was no distinct evidence of the denial by the defendants and those under whom they claimed of the right of the plaintiffs to use water for their paper mill until 1847. Both parties claim title under Jonathan Wales. The defendants claim so much of the water privilege as was granted by the deed from Wales to Smith and others in 1802. The plaintiffs claim all that remained in or was reserved to Wales by that deed.

The complainants in their bill, which was filed in the supreme court in November, 1847, set forth the facts above stated, among others, deducing their title from Wales, the original grantor of the defendants ; and claim to use as much water for their paper mill, erected in 1807 on the site of the old forge, as was wanted for the forge at the date of the deed under which the defendants claim, and, in addition to that quantity, as much as would be sufficient for two blacksmith's bellows. They also allege that since the 1st of January, 1846, when the defendants put their paper mill

in operation, the defendants have at all times, when there was not water enough to carry both mills, used and drawn down the water in the race so as to obstruct, hinder and prevent the complainants from carrying on their business; depriving them of the water to which they were entitled. The prayer of the bill was for an injunction against the defendants.

The defendants in their answer deny that since their paper mill was put in operation they have drawn down the water so as not to leave what was wanted for a forge, &c.; and they further insist that by the true construction of the deed and agreement of the 4th of May, 1802, the complainants have no right to use any part of the water for any other purpose than that of driving a forge and two blacksmith's bellows; that the privilege was confined to the particular forge then standing, and that when the same was torn away, and the water no longer wanted for that forge, the privilege ceased, and consequently, that the plaintiffs have no right to use the water for any purpose whatever.

The cause was heard at a general term in Onondaga county, in March, 1849. The court held the reservation to be general and perpetual, and that the reference to the bellows was only as a measure of quantity; but dismissed the bill, on the ground that an adequate remedy existed at law. The plaintiffs appealed to this court.

*F. Kernan* for the appellants.

*S. Beardsley* for the respondents. ·

RUGGLES, J. The first question to be determined arises upon the construction and effect of the deed of 1802; and for that purpose the deed and agreement, being cotemporaneous instruments relating to the same matter, are to be read and considered together.

On this point I concur entirely in the opinion delivered in the court below, that by the language used by these parties, they intended to specify the quantity of water granted, and the quantity retained or reserved, and not to limit the mode or purpose for which the part granted or reserved should be used. A strict adherence to the letter of the instruments might, perhaps, lead to a different conclusion with respect to the rights of both . parties. The agreement recites that the conveyance was made "for the purpose of building an oil mill," and the race was to be widened so as to be "sufficient to carry said oil mill;" and the agreement in the body of the deed was that the grantees should have the privilege of the water that was not wanted for the forge and two blacksmith's bellows. But a construction which would limit the use of the water to the purposes alluded to in these instruments would be not only against public policy but against the manifest interest of the parties. A bargain of that kind would be greatly to the disadvantage of both, and it cannot therefore be seriously believed that either party intended to bind himself or the other to the use of the right granted, or the right reserved, for any single specified purpose. The case of *Cromwell* v. *Selden* (3 *Comst.*, 253) is very much like that now under consideration, and confirms the construction given to the deed now in question in the court below. It is unnecessary to refer to cases beyond that and the cases there cited.

The acts of the parties are entirely in conformity with this construction. Wales, the grantor, converted his forge into a paper mill in 1806 or 1807, and the water reserved in the deed of 1802 has been used for the purpose of propelling the paper mill for nearly or quite forty years, without question or objection on the part of the owners under the grant of 1802. The uniformity with which the plaintiff's right to a preference in the use of the water for that purpose was asserted on his part, and acquiesced in by the

owner of the oil mill, proves that it has been used under a claim of right. This long acquiescence may be properly regarded as a practical construction of the conveyance settled between the parties themselves, by which the right of the complainants to use the water for the purpose of driving the paper mill is established.

But in regard to the point on which the case turned in the court below, I am compelled to differ in opinion from that court. The bill was there dismissed on the ground that the court of chancery had not concurrent jurisdiction with a court of law in a case like the present, and that no relief in equity could be granted until the right had been first settled at law. The right of the plaintiffs to use the quantity of water specified in the deed of 1802, for the purpose of driving their paper mill, is entirely clear, especially when connected with the long and uninterrupted use of it for that purpose. The defendants have stated no fact in their answer to put the complainants' right in doubt. The only real difficulty between the parties, after settling the construction of the deed of 1802, arises from the want of some satisfactory mode of determining, not only for the present but the future, what quantity of water the parties are respectively entitled to, and to fix it by actual measurement. As long as this is left undone, the parties will be in continual controversy.

The jurisdiction of the court of chancery in cases of this description is well established. The question here is not whether a preliminary injunction ought to have been granted, but whether a court of equity has power of granting relief. This question was determined in favor of the jurisdiction of a court of equity in the case of *Gardner* v. *The Trustees of Newburgh* (2 *John. Ch. R.*, 162), and in the case of *Belknap* v. *Trimble* (3 *Paige*, 577, 585, 600). It is true that in the case of *Reid* v. *Gifford* (6 *John. Ch. R.*, 19), a preliminary injunction was refused on a bill for relief against the diversion of water from the mills of the complainant; but the case

cannot be understood as overruling the doctrine on which the same learned chancellor ruled in *Gardner* v. *Newburgh,* and if it were to be so regarded, the authority of the case last mentioned is reaffirmed by the decision in *Belknap* v. *Trimble.* (*See also* 2 *Story's Eq.,* § 927.)

The construction of the instruments in writing under which the parties respectively claim title may as well be declared in the one court as in the other; and especially where, as in this state, the remedy at law and the remedy in equity are administered in the same court and by the same judges. The mode in which justice is administered in a court of equity is much better adapted to the speedy and final settlement of the present controversy than the forms of a suit at law. It can be done in equity in a single suit. The litigation might continue through a great number of actions at law. The remedy in equity is preventive as well as remedial. The remedy at law is not so. The parties may have or might have had an issue to be tried by a jury if desirable. But the principal questions to be submitted to a jury in the present case relate to the quantity of water granted by the deed of 1802, and the quantity retained by the grantor; and whether the defendants have taken and diverted from the plaintiff's paper mill more than they were entitled to.

The learned judge who delivered the opinion in the court below observed, " if we should attempt to ascertain the quantity of water to which the plaintiffs are entitled, the evidence is so conflicting that we should necessarily be left to conjecture." This is undoubtedly true, and a jury in a court of law or on an issue in chancery would have the same or greater difficulty. In an action at law to recover damages for a wrongful diversion of the water, the jury would have to inquire, first, how much water was wanted for the old forge and two blacksmith's bellows; and secondly, whether the defendants diverted the water so as not to leave that quantity. These might involve incidentally other inquiries as to the

relative quantities wanted for the old forge and for the plaintiffs' paper mill; as to the condition of the creek as to fullness; as to the state of the dam and race, and as to the condition of paper mills in respect to their machinery, and to the waste of water. Sometimes the result of a suit at law might depend upon a fact not involving the disputed right between the parties, and sometimes it would be impossible to ascertain the grounds on which the verdict was found. Every juror would probably have the same difficulty in understanding and reconciling the evidence, which was felt in the court below and which is fully appreciated here. The verdict of a jury, finding that too much water was diverted at one time, would be no guide to another jury in determining whether too much was diverted at another time. So that if the parties are left to their remedy at law, they are left to endless, expensive, unsatisfactory and useless litigation.

The true and proper remedy was in the court of chancery, and the mode by which the controversy can be determined with the least expense, and the greatest certainty of doing justice, is by a reference to one or more suitable referees; one of whom should be a capable engineer or millwright. Such a referee can learn more of the true merits of the case in a day, upon an actual view and examination of the mills and premises, than a jury or court can ever learn from hearing or reading the testimony of witnesses. This observation may not be true in regard to the question how much water was wanted for the old forge, but it is undoubtedly true of various other material facts in regard to which the witnesses have testified. And after such a view the testimony already given can be far better understood and appreciated than by a jury or a court without a view. If it should be found impossible to ascertain with certainty the quantity of water reserved by the deed of 1802 as water wanted for the old forge, resort may then be had, for the purpose of settling that question, to the quantity used by the plaintiffs and their predecessors for a paper mill, for a long period of time, under

a claim of right and by the acquiescence of the defendants or those under whom they claim.

This course of proceeding by a reference and view has another advantage over an action at law. It enables the court to exercise its power of preventing future litigation. Power may be given to the referee to prescribe and establish, under the direction of the court, some fixed mechanical gauge by which the quantity of water to which the plaintiffs are entitled may be kept within the main race, and not drawn off into the defendants' side race. This has frequently been done in cases of this description; and where parties cannot otherwise agree, and are disposed to be litigious, it is perhaps the only mode of preventing continual irritation and litigation between them.

I think the supreme court erred in dismissing the complainants' bill for the want of jurisdiction in chancery. I have suggested the course proper to be pursued in the supreme court when the case shall have been sent back; leaving it, however, to that court to take such course for the determination of the controversy as may upon the application of the parties, or in the discretion of the court, be deemed most apt to lead to a speedy and proper conclusion of the controversy.

PARKER, J. The defendants insist that the plaintiffs have no right to use the water of the creek, except for the purpose of running a forge and two blacksmith's bellows. But this position is untenable. The forge and two blacksmith's bellows are mentioned as the measure of quantity, and not as the only objects to which the use of the water could be applied. Nor are the defendants limited to a use of the water for the purpose of an oil mill alone. They have a right to use all the surplus water beyond what was reserved to the grantors of the plaintiffs. The plaintiffs are entitled to use water enough for a forge and two blacksmith's bellows. They may apply it to any other kind of machinery,

and it appears to have been applied to the propelling of a paper mill for about forty years. To that extent the plaintiffs are entitled to a preference in the use of the water. If there is a surplus beyond it, the defendants are at liberty to use it for propelling their paper mill. But they are not at liberty to interfere with such preference by diverting to their own mill the water which was necessary to the plaintiffs' mill. Such diversion is, I think, clearly established by the evidence. So far I concur fully in the opinion expressed in the court below as to the legal rights of the parties under the deed and contract; but I cannot concur in the conclusion of that court that this is not a proper case for equitable relief; on the contrary, I think a proper case is made out by the allegations in the bill and the proofs taken, to authorize that court to grant the relief by injunction prayed for in the bill. It is well settled that courts of equity have concurrent jurisdiction with courts of law in cases of private nuisance of this character. The plaintiffs need not set forth in the complaint all the reasons that might be given why an injunction should be granted. It is enough that it appears from the facts set forth in the bill of complaint and from the proofs, that the plaintiffs' right is unquestionable and has been recognized by ancient use and enjoyment, and that the diversion, being a recent act, has the effect to prevent the plaintiffs from carrying on business at their mill. All this appears in this case, as well from the bill of complaint as the evidence. It is not necessary to allege in terms that the threatened injury will be great or irreparable, if it is apparent from the facts set forth that such must be its effect; nor is it necessary in such a case first to establish a right at law. In *Gardner* v. *The Village of Newburgh* (2 *John. Ch. R.*, 165), it was decided that the court of chancery has a concurrent jurisdiction with courts of law, in a case of private nuisance by diverting or obstructing an ancient water-course, and may issue an injunction to prevent the interruption, though the plaintiff

Olmsted *against* Loomis and Graves.

has not established his title at law ; and Chancellor KENT said, "the foundation of jurisdiction in such a case is the necessity of a preventive remedy, when great and immediate mischief or material injury would arise to the comfort and enjoyment of property." In that case an injunction was granted on the grounds that the right to the use of the stream, of which the plaintiff was in the actual possession, had been immemorially enjoyed, and "that the plaintiff would receive immediate and great injury by the suspension of all those works on his land which are set in operation by the water."

In *Arthur* v. *Case* (1 *Paige*, 447), it was held that where hydraulic works were erected on both sides of a private stream, the owners of the works were each entitled to an equal share of the water, and that if the owner of the mills on either side attempted to deprive the other of the use of his share of the water, of which he had been in the quiet enjoyment, and thus to destroy his mills, an injunction would be granted, as the injury might be irreparable. In *Belknap* v. *Trimble* (3 *Paige*, 577), the complainants were the several owners of different mills, situated upon the same stream, which mills depended upon a particular use of the waters of a pond at the head of the stream for the running thereof, and, as such mill owners, had been in the uninterrupted use and enjoyment of the water in a particular manner for more than twenty years ; and it was held that the court of chancery had jurisdiction to establish their right to such use of the waters of the pond and to restrain the defendant from disturbing them in the enjoyment thereof. It was decided in that case that where different mill owners have a common right to an artificial use of water for their respective mills, the court of chancery had jurisdiction so to regulate the common use of the water as to preserve the rights of each.

The cases where a court of chancery has refused to entertain jurisdiction, and sent the plaintiff to a court of law for

SEL.— VOL. V.        55

relief, are where the right interfered with has not been "long previously enjoyed," as in *Van Bergen* v. *Van Bergen* (3 *John. Ch. R.*, 282), or where the act of diversion complained of took place more than three years before the bill filed, as in *Reid* v. *Gifford* (6 *John. Ch. R.*, 19; *see also* 1 *Cox's Cases*, 102; *Brown's Case*, 2 *Vesey*, 414). The decisions on this subject are generally collected in *Story's Eq. Juris.*, § 927, and in *note* 2 to the same section.

If it is established that a long enjoyed right of the plaintiffs has been improperly interfered with by the defendants, it is no objection to entertaining jurisdiction of the case that there is an uncertainty as to the measure of right or as to the precise language in which to describe it intelligibly in an injunction; "*id certum est, quod certum reddi potest;*" and if it were necessary, this case might now be sent to a referee to ascertain and report, after a scientific examination, the precise quantity of water requisite for the use of a forge such as Wales had and two blacksmith's bellows. But I think in this case such a reference is unnecessary. A paper mill was substituted for the forge over forty years ago and has been constantly used there since; and the fact that one of the owners of the oil mill assisted at its erection, and that it had been allowed to run so many years undisturbed, affords very satisfactory evidence that the general use of the water for the paper mill did not vary materially from the quantity necessary for the forge.

After such a lapse of time I think it is right to say that the plaintiffs are to be protected in the use of whatever water is necessary for the running of their paper mill as it had been run for twenty years previous to 1847, and that the defendants ought to be restrained by injunction from drawing water from the dike so as to deprive the plaintiffs of the use of the water to that extent.

ALLEN and DENIO, Js., gave no opinion, the latter having been counsel in the court below.

All the other judges concurring in the foregoing opinions the cause was remitted with leave to the parties to proceed by reference or otherwise, upon the principles laid down in the opinion of Ruggles, J.