Argued April 2, reversed May 1, rehearing denied July 11, 1928.

## CHARLES F. CLASEN *v.* CHESTER M. KENNEDY.

(266 Pac. 1073.)

For appellant there was a brief over the names of *Mr. N. G. Wallace* and *Mr. Donald M. Graham,* with an oral argument by *Mr. Wallace.*

For respondent there was a brief and oral argument by *Mr. Denton G. Burdick.*

BROWN, J.—Some time during the year 1907 the plaintiff settled upon a tract of land situate in what is now known as Jefferson County, Oregon. The land was drained by a small stream known as Wilson Creek, a tributary to Hay Creek, which, in

turn, empties into Trout Creek. At the time of plaintiff's entry, the portion of his land on the west side of Wilson Creek had been irrigated and used by a partnership known as Lyle & Brown, the owners of adjoining lands. A few years later Lyle died and the partnership was succeeded by Veazie & Brown, Willis Brown, the senior member of the new partnership, remaining in actual control of the partnership lands until his death.

After the plaintiff entered upon the above-described lands, a ditch that had been constructed under the direction of Lyle in his lifetime was carried higher up the hill in order to cover more lands of both Veazie & Brown and this plaintiff. This change in the location of the irrigation ditch was made with the consent of Brown, and plaintiff performed labor in the construction thereof. Plaintiff swore that he worked upon the ditch under an express agreement with Brown that the ditch could be used for the purpose of conveying water to plaintiff's lands, and that he cleaned out the ditch yearly in consideration of the use of the ditch. He testified that, in 1908 or 1909, he commenced to irrigate eight acres on the east side of Wilson Creek, taking the water from that stream. He further said:

"I took it out by the old McPherson place * * .

"Q. How far was that from your place? A. A little better than a quarter of a mile.

"Q. Now, is that the ditch that is mentioned in this complaint here? * * A. Yes, that is the same ditch. * *

"Q. Did you ever enlarge that, plow it bigger? A. Yes, I made it bigger.

"Q. On the Kennedy property, now? A. Yes.

"Q. How far did you build it bigger? A. All the way around.

"Q. Clear around to the creek? A. All around. * *

"Q. Did you have a talk with Mr. Brown about it? A. Yes.

"Q. What did he say to you? A. Well, he said, one time I was helping them digging in the ditch, and he told if I clean out the ditch * * he let me use the ditch. * * Then we kind of made an agreement that I keep the ditch in shape and use the ditch.

"Q. Now, what was that agreement? A. The agreement was that I use the ditch for cleaning it out every year.

"Q. Use it for what? A. For irrigating purposes, run my water through it, irrigating this alfalfa.

"Q. Did anybody pay you for building that ditch any bigger? A. No, no.

"Q. Do you remember how long after you took up this property that you built that ditch bigger? A. Well, it was in 1908 or 1909, I don't know which one of the two years."

After testifying that he enlarged the ditch, he swore that Brown "told me that I keep that ditch in repair and shape I could use the ditch right along; it would be my ditch, partnership ditch, like." He further testified:

"Q. Now, beginning with the year that you built that ditch bigger, did you always every year use it after that? A. Well, I used it every year. Sometimes I didn't need quite so much water. If I couldn't run it in the spring, I run it in the winter time. That is the way I used it, but I * * had enough to irrigate it pretty near always. * *

"Q. How long did Mr. Brown stay on that Veazie property, the property that Mr. Kennedy has got now, after you went there? A. I think it was 1918 or 1919."

He testified that upon the death of Mr. Brown one Simpson had charge of the place, and that during that time he continued to clean out the ditch for its use; that Kennedy, this defendant, came and took charge of the premises upon which the ditch is situate in 1920, and that plaintiff continued to use the ditch in consideration of his cleaning it out annually, but that about two years prior to the commencement of this litigation Kennedy questioned plaintiff's right to its use.

The plaintiff's testimony is corroborated to some extent by Owen Brown, son of Willis Brown, and by J. A. Cottengin, Joseph Oswald, Milford Fuston, Mrs. S. Fuston and Sam Ellis, watermaster of Jefferson County. Mr. Ellis testified that the defendant complained to him that, because the plaintiff was using the water flowing through the ditch, there was an insufficiency of water to satisfy his own water right, and that his right was prior to the plaintiff's right, but that defendant did not dispute the plaintiff's right to use the ditch for conveying water to his premises.

In *Foster* v. *Foster,* 107 Or. 355 (213 Pac. 895), this court held that, where the construction of an irrigation ditch over the land of another was a common enterprise for the mutual benefit of both parties concerned, the owner of the land should not, in equity and good conscience, be permitted to revoke the right to use the ditch, where revocation would occasion great damage. In support of this proposition, the court quoted from the case of *Lavery* v. *Arnold,* 36 Or. 84 (57 Pac. 906), where Mr. Justice MOORE wrote:

"It has been held in this state that a parol license to do some act upon the servient estate cannot be

revoked after the licensee, relying upon the faith thereof, has expended money or performed labor in making valuable and permanent improvements upon real property: *Coffman* v. *Robbins,* 8 Or. 278; *Huston* v. *Bybee,* 17 Or. 140 (20 Pac. 51, 2 L. R. A. 568): *Combs* v. *Slayton,* 19 Or. 99 (26 Pac. 661); *Curtis* v. *La Grande Water Co.,* 20 Or. 34 (23 Pac. 808, 25 Pac. 378, 10 L. R. A. 404 (484); *McBroom* v. *Thompson,* 25 Or. 559 (37 Pac. 57, 42 Am. St. Rep. 806); *Garrett* v. *Bishop,* 27 Or. 349 (41 Pac. 10). But such license must result from some consideration paid by the licensee, or some benefit accruing to the licensor * * *."

■ It appears from the record that the defendant went into possession of the tract of land upon which the ditch forming the subject matter of this litigation is situate and for a term of years accepted his grantor's obligation to the plaintiff without question, and that he never denied plaintiff's right to use the ditch until such time as he believed the plaintiff was taking more water than he was entitled to. Under these facts, he cannot now be heard to say that the plaintiff was not within his rights in using the ditch.

■ There is some testimony, negative in character, to the effect that witnesses saw no alfalfa field on the east side of the creek until about 1916. As a general rule, negative testimony is not of great value. However, the testimony in support of plaintiff's claim for damages is insufficient to show that plaintiff suffered any substantial loss or injury to his orchard or meadow. He says he thinks two or three trees died from a lack of water. Accepting this as true, there is much testimony indicating that, with the exception of about two trees, the orchard was in good condition.

On the question of damages sustained by plaintiff by the destruction of the irrigation ditch, from the record before us it is not possible to determine the extent of such damage.

The decree of the lower court will be reversed and one entered here restraining the defendant and his agents from preventing or in any manner interfering with the plaintiff's reconstruction of the irrigation ditch herein involved.

REVERSED AND DECREE ENTERED. REHEARING DENIED.

RAND, C. J., and BEAN and BELT, JJ., concur.